## COURT OF COMMON PLEAS BALTIMORE CITY.

Filed October 29, 1913.

STATE OF MARYLAND, EX REL. ALFRED H. SAYERS,

VS.

THE SHEPPARD AND ENOCH PRATT HOSPITAL.

*T. Scott Offutt* and *Harry B. Wolf* for petitioner.

*Edgar Allan Poe* for guardian.

ELLIOTT, J.—

It may be worth while, in the first place, to refer briefly to the facts as they have developed in testimony, so far as those facts go to show the circumstances under which this petitioner is detained in the Sheppard and Enoch Pratt Asylum.

On the 26th of April, I think it was, the petitioner came to Baltimore with his guardian, a guardian appointed by the courts of Missouri, where the petitioner was then a resident, and under authority which those courts had. The petitioner came to Baltimore with his guardian for the purpose of obtaining the benefits and advantages of treatment of which the petitioner admitted that he stood in need. He came first to the Sheppard and Enoch Pratt Asylum and was transferred a few days later, or went a few days later, to the Hopkins Hospital for the purpose of observation; in other words, for the purpose of allowing the physicians in charge to come to a conclusion as to the methods of treatment which would be, under all the circumstances of the case, beneficial to the petitioner. He went to the Hopkins Hospital as he had gone to the Sheppard and Enoch

Pratt Asylum, voluntarily, and it was while at the Hopkins Hospital that the voluntary character of his stay there was dispensed with. Dr. Meyer has testified that, after having had an opportunity of observation, and having come to the conclusion that the patient was suffering from what is termed circular insanity, there was a decision by the Hopkins Hospital authorities that it was not advisable to retain the patient there, but that he had better be sent to the Sheppard and Enoch Pratt Asylum, and accordingly he was sent and is still retained there.

Now, one of the pieces of testimony that impressed the Court very much at the time, being as it was a frank statement by the witness of the legal situation of this patient, was the fact that there was obtained a certificate of two physicians as to the mental condition of the petitioner and as to the necessity of some treatment, and the witness said, as I recall it, that this medical certificate, this certificate of two doctors, was obtained for the purpose of protecting the hospital. In other words, if the Sheppard and Enoch Pratt Asylum had accepted custody of the petitioner and had retained that custody against objection without the certificate of the doctors, which, to the extent of the certificate, might have justified that custody, the hospital itself would have made itself responsible. It is clear from that, if you please, that there was in no sense, as we understand it, in the State of Maryland, any legal commitment of this man to the Sheppard and Enoch Pratt Asylum, and the only thing was this certificate, which, to that extent, might be considered as freeing the Sheppard and Enoch Pratt Asylum from any liability for the acceptance and detention of the patient.

Now, it is not worth while for the Court to go at very much length into a discussion of the testimony relating to this young man's stay at the Sheppard and Enoch Pratt Asylum. I want, as far as I can, to give emphasis to the fact of my confidence in the authorities of the Hopkins Hospital and of the Sheppard and Enoch Pratt Asylum. The persons in charge of those institutions are persons who, by experience and skill, known skill, justify the confidence of the community, and I shall content myself simply with a conclusion in that regard that men competent to judge and competent to decide have come to the conclusion that by reason of certain exhibitions which the petitioner has given in their presence and under their care, they are of the opinion that he needs treatment for a mental disorder.

Now, adverting just for a moment to the main discussion, the Court has been referred by counsel to Article 42, Sections 19 and 20 of that article. If I understand the conclusion to which they would lead the Court from the provisions of that Article, those sections of that article, that conclusion is this: That whenever a guardian, created for the purpose of protecting the estate of a minor and charged before the law with his custody, comes to the conclusion that that minor needs treatment in an insane asylum there is full authority under the law for the guardian to immure the infant, and that no court has any right to question that. It would not, of course, be contended for a moment that anybody having the physical custody of an adult could put that adult in an insane asylum, it would not be contended for a moment that if the person having such custody obtained the certificate of two reputable and competent physicians that the party alleged to be insane could be put into an insane asylum and kept there without any further proceedings, and I am unable to come to the conclusion that a guardian, being under the impression and of the opinion which the guardian of this petitioner seems to be under, has a right, without question, to make any disposition that he pleases of the person of his ward. I think, in other words, as an infant he has just the same protection under the law that an adult has, and even if there might be some cases in which the Court would be of a disposition to confide the custody of an infant to his guardian, the age of this petitioner would rather influence the Court in the other direction, and I am unable to make one ruling for a young man of twenty years of age and make an entirely different ruling for this young man if he were over the age of twenty-one years.

Now, in addition to that, Section 19 says that a minor held in any custody under a commitment or otherwise, for care and guardianship, is said to be in private custody within the meaning of Section 20. Does that mean that a

minor for whom a guardian has been appointed by proper authority, and to whose care the estate of that minor has been committed, and who is held responsible for his custody, and that is the only thing that has been done, does that mean that that is a case of private custody? As I understand the phrase "private custody," it means a special custody, it means a custody the fact of which and the extent of which has been defined and limited by a commitment, or by the act of some competent authority outside of the guardian himself. It does not mean, as I interpret the phrase, that when an infant is committed to the custody of his guardian he is committed absolutely to the discretion of that guardian and that that guardian has a right to do with him as he pleases. Now, unless it does mean that, and to the extent that it does not mean that, an infant is under exactly the same circumstances as to the custody of the person that an adult is.

Now, going back to the main branch of the question. The petition to this Court is to relieve and release the petitioner from what, from the custody of the Sheppard and Enoch Pratt Asylum and from a custody which is exercised over the petitioner without regard to his wishes at all. No one could have sat in Court during the hearing of the testimony in this case, even during the testimony of the petitioner himself upon the stand, without at any rate yielding to a suspicion, if it were not stronger than that, that this petitioner is mentally unsound and is unsound to such an extent that the conclusion of that unsoundness is forced upon the mind of the petitioner himself. That unsoundness being either admitted or demonstrated would seem to imply a proper course of treatment with the object of curing the unsoundness, if it may be. But I have nothing to do with that question on the proceedings that have been instituted before this Court. I have only to consider a single question; I am here representing the State of Maryland and the laws of the State of Maryland. I am here to say whether it is possible, under any jurisdiction, so far as the petitioner himself is concerned—not, of course, involving anybody else—whether under any condition it is possible for a guardian of an infant to bring him into this State to put him in one of our institutions and to keep him there against his will

without a compliance with the same laws which we would require to be complied with in order to put one of our own people in the same institution.

I am not at all impressed with the danger of this man to the community. I have heard something of threats and with what are alleged to be homicidal tendencies—

MR. POE: I did not call your Honor's attention to certain authorities on the point that you are now about to discuss. It may be too late, but I have those authorities if you Honor wishes them.

THE COURT: Let me take it for granted, sir, that I know them. I am not at all impressed with the testimony in this case so far as it goes to show homicidal tendencies of the petitioner. If I were of the impression that this man's mental condition, or that anything that this man had said, would possibly result in a homicide, I would be not only abundantly justified in detaining the prisoner in a place where he could not give vent to those tendencies, but it would be my duty to do so. But what is the testimony with regard to these homicidal tendencies? I have no disposition whatever to enter into any controversy with the doctors or to criticize them in any way further than to say this: I understand the use of the term to be this, that when a man threatens to kill another it is to be presumed that he has a disposition at the time of the threat to kill him, and that it may be said in that particular that there is a tendency towards homicide. But every one of these threats were made when the petitioner was under the excitement of a recollection of what he termed bad treatment, and it is worth while, while we are discussing this subject to allude to one of these threats of homicide, a threat which might very well not be carried out and as to the carrying out of which there might never be any attempt, and that is the threat against Dr. Henderson. If Dr. Henderson ever went out of the State of Maryland he was to be killed, according to the testimony given on the stand. Well, Dr. Henderson might stay in the State of Maryland and might never go out of the State of Maryland, and if you are to take that statement on the part of this young man as an indication of the intention to kill Dr. Henderson, the probability

of the killing is so remote that it is not worth while for this Court to adopt means to prevent its being carried. But all these threats were made under circumstances in view of which I am not altogether prepared to say that a man of perfectly sound mind, but of violent temper, might not have made the same threats without any intention whatever of carrying them out. In other words, I am not impressed at all with these statements. A man who is going to kill does not usually notify the man that he is going to kill; he does not usually notify anybody else that he is going to kill this particular man. And the circumstances under which this young man made that statement were circumstances which, if the man believed the circumstances were as objectionable as this petitioner seems to think they were, or even as the testimony of the attendants would justify this Court in believing, they were circumstances which might have made anybody mad for the time being.

Now, the general jurisdiction of this Court has been appealed to in this regard, and it is ordinarily a very good ground upon which to appeal to the discretion of the Court. This Court is reminded that it is its duty to consider the welfare of the petitioner, that it is its duty possibly, although I am not sure that counsel for the respondent go to that extent, it might possibly be claimed that the discretion of this Court ought to be exercised along the line of the welfare of the petitioner in this case, even though the action of the Court might not strictly comply with the requirements or regulations of the law. Now I will admit for the sake of argument, and only for the sake of argument, that there might be some circumstances under which that would be a prevailing argument. What conclusion do I come to if the question, the single question were presented to me as to whether or not I think it is for the mental welfare or physical welfare of this man to go back to the institution where he is at present detained? As I said before, I have no disposition to criticize the institution, but it is perfectly plain to this Court that this petitioner is better off almost anywhere else than in the Sheppard and Enoch Pratt Asylum. I have no right and I have no desire to disorganize the institution. I believe that the institution has tried to obtain an attendant who would be personally grateful to this petitioner, but there has hardly been an attendant upon this stand, I am not sure that there has been any, I think there may have been one, who still held out a hope of his ability to get along with this petitioner. If I sent this petitioner back to the Sheppard and Enoch Pratt Asylum I would do so in a hope that a result would happen which has not happened heretofore, and I would subject this man for the purpose of treatment and for the purpose of an ultimate recovery to conditions which, at the present time, have acted disastrously upon him, because if this man is not worse than when he went into the institution, there is no reason for his detention there, his legal detention there, because up to this time I have heard no argument addressed to the Court that he was at all dangerous except in this one single case of a danger to himself through suicide. Under all circumstances in this case that danger does not appeal to this Court.

Therefore it follows, gentlemen, that neither from considerations for the public welfare, nor for considerations for the welfare of the petitioner himself, ought this Court to be moved to return this petitioner to a custody which has never, up to this time, been properly obtained. And if I should send this man back to the institution I should practically oblige this Court to go on record as saying that it depends wholly and entirely upon the will of a guardian, even though properly appointed, as to whether or not his ward should be detained in an insane asylum.

Now there is just one thing more that I wish to say in passing. I was very much impressed with a remark which one of the counsel for the respondent made in his argument, and that is this: Why should the stigma of insanity be fixed on this young man? And I quite agree with him, but until the fact of insanity is fixed upon this man and fixed in a legal method according to the laws of the State of Maryland, he is entitled to his liberty. I shall therefore release the petitioner from the present custody.

I have no right to interfere in any way, and I am not to be understood as attempting to interfere in any way, with the jurisdiction of the laws of Missouri over this man and with the power which the guardian has been

granted under those laws. I simply, under the laws of the State of Maryland, as I understand them, release this man from the custody of the respondent.

Now, gentlemen, there is just one thing more I want to say: It is a decision as to the question of costs. It must be perfectly apparent to everybody that it was the duty of the Sheppard and Enoch Pratt Asylum to detain this man under the apparent right which was granted to them by the guardian. It is to be remembered that the petitioner went to the Sheppard and Enoch Pratt Asylum in the first place voluntarily, and that even though he has been detained there, evidently against his will, the Sheppard and Enoch Pratt Asylum was abundantly justified in believing that the guardian, by reason of his appointment and by reason of his authority granted him by the State of Missouri, had the right to detain him against his will. Therefore, there ought not to be any costs visited upon the Hospital, and I will grant the petition releasing the petitioner from custody and putting the costs upon his guardian, who has appeared in Court here and undertaken to give force to his detention. I shall therefore put the costs upon the guardian.